IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| TRI-UNION DEVELOPMENT | § | CASE NO: 03-44908 |
| CORPORATION, TRI-UNION | § | |
| OPERATING COMPANY | § | |
|     Debtors. | § | |
| | § | CHAPTER 11 |
| | § | |
| JEFFREY A COMPTON, TRUSTEE, OF | § | |
| THE TRI-UNION CLASS 4A | § | |
| CREDITORS' TRUST, | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 05-3761 |
| | § | |
| TANNER CONSTRUCTION COMPANY | § | |
| OF TEXAS, INC., | § | |
|     Defendant. | § | |

## MEMORANDUM OPINION

For the reasons stated below, the Court finds that the disputed transfers[1] at issue in this adversary proceeding qualify as transfers in the ordinary course of business. Consequently, the Trustee is not entitled to recover the transferred funds as a preference.

### Background

Tri-Union Development Corporation ("Tri-Union" or "Debtor") filed for bankruptcy on October 20, 2003. Prior to filing, the Debtor transferred the sum of $178,492.66 to the defendant, Tanner Construction Company of Texas, Inc. ("Tanner").

On October 17, 2005, Jeffrey Compton, Trustee of the Tri-Union Class 4A Creditors' Trust ("Trustee"), filed this adversary. Trustee alleges that the following transfers are avoidable under 11 U.S.C. § 547(b):

---

[1] Tanner stipulates that two transfers, each in the amount of $479.50, to pay Invoice Nos. 12599 and 12600, are avoidable under 11 U.S.C. § 547(b).

1

| Check Number | Check Amount | Check Date | Check Cleared | Invoice Date | Invoice Number | Amount Paid |
|---|---|---|---|---|---|---|
| 40383 | $31,345.21 | 8/15/2003 | 8/26/2003 | 4/30/2003 | 12600 | $479.50 |
|  |  |  |  | 4/30/2003 | 12599 | $479.50 |
|  |  |  |  | 6/30/2003 | 12710 | $30,386.21 |
| 40489 | $44,905.60 | 8/21/2003 | 9/3/2003 | 7/31/2003 | 12800 | $44,905.60 |
| 40508 | $48,229.85 | 8/21/2003 | 9/3/2003 | 8/19/2003 | 12821 | $19,374.85 |
|  |  |  |  | 8/19/2003 | 12822 | $6,447.00 |
|  |  |  |  | 8/19/2003 | 12823 | $22,408.00 |
| 40692 | $54,012.00 | 9/22/2003 | 9/30/2003 | 9/30/2003 | 12884 | $54,012.00 |

Tanner asserts the affirmative defense of § 547(c). In particular, Tanner asserts that the transfers were made in the ordinary course of business and a new value defense so that the transfers may not be avoided. With respect to the last two transfers, Tanner also asserts the contemporaneous exchange for new value affirmative defense.

On August 25, 2006, the Court held a trial in this case. The Trustee's case in chief, asserting that § 547(b) transfers were made, was stipulated to by Tanner. Tanner further waived all § 547(c) defenses with respect to the first two transfers, each in the amount of $479.50, to pay Invoice Nos. 12599 and 12600. Consequently, the only issues to be resolved are Tanner's § 547(c) defenses with respect to the remaining transfers. At the conclusion of the evidence, the Court requested briefing on whether the Court may reach a conclusion as to whether a transfer is within ordinary business terms within the industry absent expert testimony on the subject. Both parties timely submitted briefs.

**Analysis**

*Ordinary Course of Business*

Section 547(c) provides that:

The trustee may not avoid under this section a transfer--
    (2) to the extent that such transfer was--
        (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

2

> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2) (amended April 20, 2005).

The ordinary course of business defense is designed to protect normal business transactions and enable the struggling debtor to continue operating its business. *In re Issac Leaseco, Inc.*, 389 F.3d 1205, 1210 (11th Cir. 2004). A creditor asserting the affirmative defense that a payment was in the ordinary course of business must prove all statutory elements (§ 547(c)(2)(A), (B) and (C)) by a preponderance of the evidence in order to prevail. *G.H. Leidenheimer Baking Co. v. Sharp (In re SGSM Acquisition Co.)*, 439 F.3d 233, 239 (5th Cir. 2006). The first two elements address whether the transfer was ordinary as between the two parties, while the third element considers the relevant industry standards.

The first element requires that the transaction was ordinary for the Debtor and the transferee. Tanner is a general oilfield and pipeline contractor that constructs and builds drilling locations. Tanner also develops and installs the production equipment when a well has previously been drilled. Tri-Union is an oil and gas production company. Thus, each party customarily engages in this sort of transaction and the debt was incurred in the ordinary course of Tanner's and Tri-Union's business affairs. The first element is met.

The second element requires that the transaction was made according to the ordinary course of Tanner and Tri-Union's business affairs. There is no precise legal test for evaluating whether a transfer complies with the second prong of § 547(c)(2). *GasMark Ltd. Liquidating Trust v. Louis Dreyfus,* 158 F.3d 312, 317-18 (5th Cir. 1998). Rather, the analysis tends to be very fact specific, with courts typically comparing prior dealings between the parties with their dealings during the preference period. *In re Tulsa Litho Co.,* 229 B.R. 806, 809 (10th Cir. BAP

1999); *GPR Holdings, LLC v. Duke Energy Trading and Mktg., LLC (In re GPR Holdings, LLC)*, No. 01-36736-SAF-11, 2005 Bankr. LEXIS 1059, *42 (Bankr. N.D. Tex. May 27, 2005). Factors on which a court may rely in determining whether a payment is ordinary for purposes of § 547(c)(2)(B) include: (1) length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) the circumstances under which the payment was made. *See, e.g.*, 5 COLLIER ON BANKRUPTCY ¶ 547.04[2][a][ii][B] (15th ed. rev. 2005); *Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir. 1997); *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir. 1994); *In re Fred Hawes Org., Inc.*, 957 F.2d 239, 244 (6th Cir. 1992).

In this case, Tanner and Tri-Union's relationship began in March 2003, seven months prior to the bankruptcy filing. Tri-Union invited Tanner to a bid meeting to prepare a cost estimate for a new Tri-Union drilling location in Mt. Belvieu, Texas. Tanner was the successful bidder and was hired by Tri-Union to construct the new drilling location. The first invoice for Tanner's work, Invoice No. 12542 in the amount of $97,792.44, was sent to Tri-Union on or about March 31, 2003. Consistent with Tanner's business practice, the invoice stated "all invoices payable in 30 days." Tanner received payment for Invoice No. 12542 on June 5, 2003, sixty-five days after the invoice was initially sent. The evidence shows that the invoice was inadvertently mailed to the wrong address on March 31, 2003, but then re-sent to the proper address. This is the only transfer that occurred prior to the preference period. Although this transfer was the only one to occur prior to the preference period, it is sufficient to establish an ordinary course of business between Tanner and Tri-Union. Even a first-time or singular transaction may be ordinary for the purposes of § 547(c)(2)(B). *See Compton v. Plains*

*Marketing, LP (In re Tri-Union Development Corp.)*, 349 B.R. 145, 150 (Bankr. S.D. Tex. 2006).

The Court recognizes that both the initial transaction and the first preference period transaction between the parties were unusual because the invoices were first mailed to an incorrect address. The first transaction between the parties occurred prior to the preference period on June 5, 2003, sixty-five days after the invoice was initially sent on March 31, 2003. The evidence demonstrates that this transaction occurred outside contract terms because the invoice was initially sent to the incorrect address and was later resent to Tri-Union's correct address. Similarly, the first challenged preference payment occurred on August 15, 2003, 46 days after Invoice no. 12710, dated June 30, 2003, was initially mailed. This invoice was also incorrectly addressed and was resent to Tri-Union on or around August 4, 2003. Both these transactions were by check. The challenged preferential transaction was for $31,345.21, less than the initial pre-preference transaction. No unusual collection activity occurred. Based on the evidence, the Court finds that the transaction on August 15, 2003, was made according to the ordinary course of Tanner and Tri-Union's business affairs when compared to the pre-preference transaction between the parties.

The amount and form of the other challenged transfers were ordinary. All transfers between the parties were by check.[2] Each check was for an amount between $44,000 and $54,000, within the mid range of prior transactions between the parties. Moreover, the evidence indicates that for Invoice Nos. 12800, 12821, 12822 and 12823—for which the invoice was mailed to Tri-Union's correct address—each transfer occurred within contract terms (30 days).

---

[2] The Plaintiff argues that the transfers were unordinary because some checks were sent by ordinary mail while others were sent using FedEx. The Plaintiff presented no evidence why Tri-Union changed its method of mailing the payments. The evidence shows that Tanner did not attempt to collect the payments faster or ask Tri-Union to vary its payment process.

Finally, there was no unusual collection activity. In evaluating the transfers in question, the Court finds that the circumstances surrounding these transfers are ordinary. In reaching this conclusion, the Court considers that a major purpose behind the preference section is to discourage creditors from "racing to the courthouse to dismember the debtor during his slide into bankruptcy." H.R. REP. 95-595 at 177 (1977).

The evidence shows like these previous invoices, Invoice No. 12884 was paid by check in an amount within the range of previous payments between the parties. However, Invoice No. 12884 was paid on September 22, 2003, eight days prior to the invoice date of September 30, 2003. Although this transfer differs from the previous transfers with respect to timing, the evidence demonstrates that this transfer was ordinary in the course of Tanner and Tri-Union's business affairs. The parties had engaged in a continuous relationship with respect to this work project since March 2003. The amount and form of tender conformed to the parties' past practice. The evidence shows there was no unusual collection activity engaged in by Tanner and that this payment was made contemporaneously because the work was ongoing.

This Court has viewed the totality of the surrounding facts and concludes that the Defendant has shown that the payments were ordinary business transactions engaged in between the parties while the Debtor continued its ordinary business operations.

The final element of § 547(c)(2) requires that the transfer was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). This element employs an objective standard and compares "the credit arrangements between other similarly situation debtors and creditors in the industry." *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 239 (5th Cir. 2006) (internal quotations omitted). To establish the industry standard, "the creditor should provide

evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." *In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th Cir. 2002). In this case, the parties dispute whether the Court may reach a conclusion as to whether a transfer is within ordinary business terms within the industry absent expert testimony on the subject. No expert testimony with respect to industry standards was presented at trial.[3] In its post-trial brief, Tri-Union argues that general testimony by an employee of Tanner is insufficient and that expert testimony is required. Although there is case law from other bankruptcy courts to support this view, the Fifth Circuit has rejected such a strict test. A creditor "may satisfy its burden through testimony by its own company representatives about the practices of other creditors and debtors in the industry, subject of course to applicable evidentiary rules. Whether such testimony is appropriately reliable is a matter best left to the bankruptcy court." *Gulf City Seafoods*, 296 F.3d at 368, n.5. The Fifth Circuit explained:

> Because 'ordinary business terms' sets an outer boundary to the parties' practices, the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be 'according to ordinary business terms.' We leave this case by case determination where it belongs-with the bankruptcy judge. We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue. Otherwise the practice cannot be considered an 'ordinary' way of dealing with debtors.

*Gulf City Seafoods*, 296 F.3d at 369.

Huntley testified on behalf of Tanner with respect to the industry standard. Huntley has worked in the oil and gas industry for approximately 25 years. He testified that he pays Tanner's creditors invoices within the industry within 30 days. He also testified that he confers with other

---

[3] The Defendant did not present any expert testimony regarding the ordinary business terms within the industry. Although the Plaintiff sought to introduce expert testimony with respect to industry standards in order to rebut evidence introduced by the Defendant, the Defendant objected to the introduction of such testimony based on Plaintiff's failure to disclose the expert testimony. The Court sustained the objection pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) as incorporated by Federal Rule of Bankruptcy Procedure 7026.

companies within the industry on a regular basis, both by telephone and in person at bid or pipeline showings and at drilling locations. Huntley testified that his competitors receive and pay their invoices with other parties within 30 day terms and that a 30-day term is the standard within the industry. Huntley also testified that it is standard for parties within the industry to prepay or pay for work contemporaneously. No evidence to the contrary was presented.

Similarly, Bryan Tanner testified on behalf of Defendant. He started the first Tanner company in 1980 and served as president and chief operating officer of the different companies until he sold the majority of the Tanner Companies on August 1, 2006. Although he employed managers, Tanner managed the overall day-to-day operations of the companies prior to the sale. Tanner now serves as a consultant to Tanner Companies. He testified that it was the ordinary practice of all of the Tanner Companies to require payment within 30 days from all debtors. In addition, Tanner's experience in the oil and gas industry includes serving as president of the Louisiana Oilfield Contractors Association for two separate terms for a total of four years. The Association has more than 100 members representing different parts of the oil and gas industry. Tanner is currently a member of the Association. Tanner testified that his experience has made him knowledgeable regarding the invoicing practices within the industry. He stated that he would know if there were terms other than net 30 days utilized in the industry and that he is unaware of different terms.

In this case, the Court is satisfied that there exists a basis in the practices of the industry based upon the evidence before the Court that the credit arrangements at issue in this proceeding are ordinary within the industry.

Because the Court finds that the ordinary course of business applies, the transfers are not avoidable pursuant to § 547(b). It is therefore unnecessary for the Court to consider the additional § 547(c) defenses raised by Tanner.

## Conclusion

Based on the foregoing, the Court finds that the disputed transfers were in the ordinary course of business. Pursuant to the parties' stipulation, the transfer of $959.00 in payment of Invoices Nos. 12599 and 12600 is avoidable as a preference under § 547(b). A separate judgment consistent with this memorandum opinion will be issued.

Signed at Houston, Texas, on November 15, 2006.

MARVIN ISGUR
United States Bankruptcy Judge